UNITED STATES of America,
Plaintiff,

v.

INDEPENDENT STAVE CO.,
INC., Defendant.

No. 74CR224–S.

United States District Court,
W. D. Missouri, W. D.

Dec. 30, 1975.

Donald R. Cooley and James C. England, Asst. U. S. Attys., Springfield, Mo., and Bruce J. Chasan, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

Ransom A. Ellis, Jr., Springfield, Mo., Thomas H. Truitt, Washington, D. C., for defendant.

ORDER DISMISSING INFORMATION

COLLINSON, District Judge.

Independent Stave Company, Inc. manufactures bourbon barrels. The entire process from sawing the staves from native white oak bolts to the final charring of the inside of the finished barrel is performed in its plant in Lebanon, Missouri.

This action was instituted by the Government filing a four-count information. The first three counts each charged a violation of Missouri Regulations S–VIII, Restriction of Emission of

Visible Air Contaminants, in violation of 42 U.S.C., Section 1857c–8(c)(1)(A).

The fourth count charged a violation of 42 U.S.C. 1857c–8(c)(1)(B), in knowingly failing to comply with an order issued to the defendant by the Administrator of the Environmental Protection Agency. This order, dated October 17, 1973, directed that for eleven enumerated "cyclone dust collector sources" the defendant "shall complete the following milestones on or before the dates specified: (1) By November 19, 1973 submit final plans for equipment sufficient to control particulate emissions from all cited sources * * *. Final plans must include at a minimum the type, efficiency and configuration of the control equipment."

The case was tried before a jury. At the trial the defendant sought to prove that the order of October 17, 1973, which was the basis of the charge in Count IV, was improperly issued, in violation of the law, in violation of the agencies' own rules and regulations, was based on facts known to the agency to be erroneous, and was arbitrary and unreasonable. The offer of proof was lengthy, involved voluminous records, a number of witnesses, and raised contested factual issues. The Court ruled, in the absence of any precedent, that in this peculiar criminal proceeding, these matters were not proper for submission to the jury, and refused the offer. Rather than recess the trial, after a number of witnesses had been heard on the other counts, the entire case was submitted to the jury, on defendant's other evidence in defense of Count IV. The issue of the validity of the October 17 order was not submitted.

The Government's evidence on the first three counts was so weak that, as the Court anticipated, the jury returned acquittal verdicts on all three. The fourth count charged that from December 10, 1973 and continuously to the date of the information, June 7, 1974, the defendant had failed and continued to fail to meet the first increment of progress contained in the order of the Adminis-

trator. The maximum penalty for a corporate defendant is $25,000 "per day of violation." 42 U.S.C. 1857c–8(c)(1)(B).

Conceding that there was a factual issue as to whether the defendant could have complied with the first increment in the brief time allotted, the Court felt that the overwhelming evidence proved that such performance was a physical impossibility. However, the proof was silent on the question of whether such compliance could have been accomplished at some date before the filing of the information. The jury returned a verdict of guilty on this count.

The Court granted defendant's motion for a new trial on Count IV, permitted the defendant to file a motion to dismiss the information on the grounds that the October order was void or invalid, and held an evidentiary hearing on this issue.

■ This procedure raises the most hotly contested legal question in the case. The Government takes the position that the sole issue in this criminal prosecution is whether the order for the implementation steps to be taken (the October 17, 1973 order) was violated. The defendant contends that it has the right to challenge the validity of the order. This Court believes that when a criminal prosecution is based on violations of an order issued by any regional administrator of a government bureau, the defendant can defend on the grounds that the order was invalid or void.

■ It is undisputed that under the law the E.P.A. has the power to enforce the provisions of Regulation S–V, "Restriction of Emission of Particulate Matter From Industrial Processes," of the State of Missouri (and approved by the E.P.A.), provided the State had granted no variance, that there was a violation, and that the State was taking no action to secure compliance.

Section 1857c–8(a)(1) of Title 42 provides that "whenever, on the basis of any information available to him, the Administrator finds that any person is in violation * * * *" the Administrator shall notify that person of the violation,

and that if the violation "extends beyond the 30th day after the date of the Administrator's notification, the Administrator may issue an order requiring such person to comply with the requirements of such plan * * *."

Subsection (a)(4) of 1857c–8 contains an additional provision that such an order shall specify a time for compliance which the Administrator determines is reasonable "taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements."

Prior to the E.P.A. entering this matter the defendant company had been dealing entirely with the Missouri Air Conservation Commission about their smoke problems (Mo. Regulation S–VIII) and their fugitive dust problems (Reg. S–VII). In fact, the defendant's officers had discussed applying to M.C.A.C. for a variance, in 1972, until these matters were resolved. However, a very lengthy strike commenced at the plant in 1972 (which continued until September 1973) and the Missouri enforcement officials advised them to wait until the plant was back in full operation before pursuing this course. The Missouri officials were very familiar with the conditions at the plant and worked with the plant officials on their problems, which mostly concerned smoke opacity (Reg. S–VIII) since the main boiler burned wood scrap exclusively.

On April 5, 1973 the regional administrator of the E.P.A. directed a letter to the defendant company which stated that under the provisions of Section 114(a)(1) of the Act (Section 1857c–9) the defendant should furnish certain data about dust emissions, either from test results or from estimates. The letter stated that the information was required to determine if the company was in compliance with S–V.

An officer of defendant company attempted to comply with this request. He called the E.P.A. office in Kansas City on several occasions to find out exactly what they wanted, since there had never been any tests. As a result of those conversations he prepared and mailed certain data to the E.P.A. His compilations were taken from a 1962 study of the plant, which he updated by estimates, of the weight of the wood the plant processed and the weight of the finished wood products. He furnished a list of the emission points where the wood was cut, sawed, jointed and sanded, the type of dust control device at each point, and the estimated efficiency of these devices.

Unquestionably these figures contained a gross error. This was because a great percentage of the waste wood never entered any air stream as dust, but fell to the floor, in such quantities that it was shoveled up, hauled away and used as the sole fuel for the main steam boiler of the plant, and the surplus was trucked away and sold to a particle board manufacturer.

Based on these erroneous figures the E.P.A. office determined by mathematical calculation that the company was in violation of Reg. S–V. This method of determination is termed a "material balance" method, as opposed to "stack testing."

On July 9, 1973 the E.P.A. issued a "Notice of Violation," calling attention to the provisions of the Act that if the violation continued beyond 30 days that an order may issue requiring compliance.

Before this violation notice was issued, the head of the engineering section of the MCAC had a conversation with officials at the E.P.A. who told him they were considering issuing such a notice, based on figures submitted by Independent Stave. This engineer, Mr. Keeling, had been working with the defendant since 1971 and did not believe there was any dust problem at this time. He was quite familiar with the plant, as contrasted to the E.P.A. officials who had never been in it. He called the defendant and requested the information that had been furnished E.P.A. After he had analyzed the figures, he again talked to the officer at Independent Stave who had prepared them, and learned how the calculations were made. It was immedi-

ately apparent to him that the figures furnished were completely erroneous because he was familiar with the amount of waste wood that did go into the airstream.

Some time in June he discussed this entire matter with one of the three E.P.A. officials who had told him that E.P.A. was considering issuing the violation notice. He explained the gross error in the figures submitted and the belief there was no violation. The answer he received was the same position that the Government has consistently taken in this entire proceeding, namely, that Section 1857c–8(c)(2) makes it a criminal offense to knowingly make any false statement in any document filed under this chapter, and that, therefore, the E.P.A. could issue its violation notice even after learning that the information was incorrect.

This Court finds that the issuance of the notice of violation under the above circumstances and based on the above premise was erroneous and a nullity. If this conclusion is correct, the entire criminal prosecution fails because all further steps leading to the order which defendant stands charged with violating are based on the violation notice.

There are a number of other procedural matters involved in the procedure followed by the E.P.A. in this case which this Court believes would invalidate the order issued in this case. The statute states that after the violation notice "if such violation extends beyond the 30th day after the date of the Administrator's notification, the Administrator may issue an order * * *" such as the order issued in this case. In this case there was no effort made by the E.P.A. in any way to determine if the violation continued beyond the 30th day. No physical investigation or testing was done, although repeatedly requested by the defendant. The Government takes the position that absent notification by the defendant that some change has been made, the agency can presume, back in its office, that the violation has contin-

ued, and that is what was done by the E.P.A. in this case.

The statute further requires that any order issued shall "tak[e] into account the seriousness of the violation and any good faith efforts to comply with applicable requirements." The transcript of the hearing at which the Regional Administrator heard the evidence upon which he based his order does not contain a single reference to either of these matters. Counsel for the Government stated at this hearing that it was the Government's position that these were considerations which had to be raised by the defendant. This position does not seem tenable, in view of the plain mandate of the statute.

For the above reasons, this Court finds that the order which the defendant is charged with violating in Count IV of this information was invalid and void, and it is therefore

Ordered that defendant's motion to dismiss Count IV of the information is hereby granted and Count IV herein is hereby dismissed.